UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | |
| ELIN ROBINSON MEJIA ROMERO, | * | Criminal Action No. 17-cr-10199-ADB |
| | * | |
| Defendant. | * | |
| | * | |

**MEMORANDUM AND ORDER**
**DENYING MOTIONS TO SUPPRESS**

BURROUGHS, D.J.

Defendant Elin Mejia Romero is charged with conspiracy to possess with intent to distribute heroin and fentanyl, possession with intent to distribute heroin and fentanyl, and illegal reentry to the United States. [ECF No. 69]. Now before the Court are Defendant's motions to suppress a search warrant for Defendant's alleged stash house located at 943 Hyde Park Avenue [ECF No. 93] and statements Defendant made on June 8, 2017 to a Boston Police Officer. [ECF No. 94]. On August 2, 2018, the Court held an evidentiary hearing on the motions, focusing on the motion to suppress the statements at issue. [ECF No. 128]. For the reasons set forth below, both motions are denied.

**I. RELEVANT FACTS**

The following facts are drawn from the affidavit of Robert White ("Agent White"), a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") [ECF No. 93-1], a Drug Enforcement Agency ("DEA") investigative report [ECF No. 95-1], and the testimony of Agent White and Defendant at the August 2 evidentiary hearing.

A.  **Controlled Purchases**

In January 2017, the ATF and the DEA began an investigation into the suspected drug trafficking activities of Defendant and his girlfriend, Noelia Gonzalez.[1] Over the course of six months, from January 2017 to June 2017, a cooperating witness ("CW") conducted five controlled buys of illegal drugs from Defendant.

1.  First Purchase: January 25, 2017

The first purchase occurred on January 25, 2017. On January 24, 2017, the CW called Defendant and asked to purchase two fingers of heroin, which Defendant told him would be $800. This call was not recorded due to an alleged equipment failure. The next day, January 25, the CW called Defendant, again to arrange the purchase, and they agreed to meet at the corner of Blue Hill Avenue and Westview Street. This call was recorded. At approximately 3:22 p.m., investigators saw a blue Ford Escape registered to Julio Mejia at 943 Hyde Park Avenue, Apartment 3, being driven by a woman, later identified as Gonzalez. The CW entered the Escape on the rear passenger side and he and Defendant completed the transaction. After a short ride, the CW exited the Ford Escape, which drove away.

2.  Second Purchase: February 14, 2017

The second purchase occurred on February 14, 2017. On that day, the CW called Defendant to arrange the purchase of two fingers of heroin, and they again agreed to meet at the corner of Blue Hill Avenue and Westview Street, the same location as the first purchase. At approximately 1:20 p.m., Gonzalez arrived driving the Ford Escape. Defendant was in the front passenger seat. The CW entered the car, which drove off. During the drive, the CW gave Defendant $800 in exchange for two fingers of heroin. After a short ride, the CW exited the

---

[1] Defendant may sometimes refer to Gonzalez as his wife, which defense counsel explained is meant in the sense of a common-law wife.

vehicle. Surveillance units then followed the Ford Escape to 359 Park Street in Dorchester. Investigators saw Defendant enter a residence while Gonzalez waited in the driver's seat. Several minutes later, Defendant exited a residence in the area of 359 Park Street and got back into the front passenger seat of the Ford Escape, which then drove away. Surveillance officers followed the Ford Escape to 20 Gordon Avenue in Hyde Park, Massachusetts, and at approximately 2:16 p.m., investigators observed Defendant get out of the Ford Escape and walk towards the side entrance of 20 Gordon Avenue. A records search indicated that the utilities for apartment #2 at 20 Gordon Avenue are in the name of Noelia Gonzalez.

       3.      Third Purchase: March 8, 2017

The third purchase occurred on March 8, 2017. On that day, the CW called Defendant and asked to purchase two fingers of heroin. Defendant agreed and told the CW to call again when he was ready to meet. After the call, investigators began surveillance in the area of 20 Gordon Avenue. At approximately 12:38 p.m., investigators saw Defendant exit the left side door to 20 Gordon Avenue, rearrange trashcans, and then reenter through the same side door. At approximately 12:40 p.m., investigators saw Defendant get into the Ford Escape, which was parked in the driveway adjacent to 20 Gordon Avenue, and drive away. Investigators followed Defendant as he drove to 943 Hyde Park Avenue in Hyde Park, Massachusetts and saw him park the Ford Escape in front of the residence. At approximately 1:03 p.m., the CW called Defendant, and they agreed to meet at the same location as the previous buys. At approximately 1:21 p.m., investigators saw Defendant exit 943 Hyde Park Avenue and get into the Ford Escape. They followed Defendant in the Ford Escape back to 20 Gordon Avenue. Shortly thereafter, investigators saw Gonzalez leaving in the Ford Escape from 20 Gordon Avenue.

At approximately 1:37 p.m., Gonzalez and Defendant arrived in the area of Blue Hill

Avenue and Westview Street in the Ford Escape, and the CW got into the rear seat behind Gonzalez, who was driving. Surveillance units followed the Ford Escape as it drove away. While in the car, the CW purchased two fingers of heroin from Defendant for $800. After a short distance, the Ford Escape stopped, and the CW got out. After they dropped off the CW, investigators followed Gonzalez and Defendant back to 20 Gordon Avenue. Gonzalez and Defendant exited the Ford Escape and entered the left side door to 20 Gordon Avenue.

    4.    <u>Fourth Purchase: May 2, 2017</u>

The fourth purchase occurred on May 2, 2017. On that day, the CW called Defendant and again arranged to purchase two fingers of heroin. Defendant told the CW to call again when he was ready to meet. After the call, investigators established surveillance in the area of 943 Hyde Park Avenue, where they saw the Ford Escape parked. At approximately 12:31 p.m., the CW placed a recorded call to Defendant to arrange to meet. Defendant answered the call, then handed the phone to Gonzalez. Gonzalez told the CW she would meet him at the same location as the previous controlled buys in half an hour. At approximately 12:43 p.m., Gonzalez called the CW to tell him she was on her way, and she also instructed him to call her phone number to arrange for future heroin purchases.

At approximately 12:55 p.m., surveillance officers saw Gonzalez arrive at the intersection of Blue Hill Avenue and Westview Street driving a grey Chevrolet Equinox. The CW got into the Equinox. Investigators followed the Equinox as it drove away. While in the car, the CW purchased two fingers of heroin from Gonzalez for $800. After a short distance, the Equinox stopped, and the CW got out. Investigators followed Gonzalez in the Equinox after she dropped off the CW. After losing the Equinox briefly in traffic, at approximately 1:10 p.m., investigators saw the Equinox parked in the driveway of 20 Gordon Avenue.

5.  Fifth Purchase: June 6, 2017

The fifth and final purchase occurred on June 6, 2017. On that day, Defendant returned a call from the CW around 1:00 p.m. The CW asked to purchase four fingers of heroin. The Defendant agreed and said he would meet the CW in twenty minutes at a Dunkin' Donuts. At approximately 1:05 p.m., surveillance units observed Defendant depart 20 Gordon Avenue driving the Equinox. Surveillance units followed the Equinox to the parking lot of the Dunkin' Donuts, which is located across the street from 943 Hyde Park Avenue. Defendant parked the Equinox and remained in the vehicle.

At approximately 1:20 p.m., Defendant left the parking lot and drove the Equinox to 943 Hyde Park Avenue. Defendant called the CW and told him he would have the heroin in fifteen minutes. At that time, investigators saw Defendant get out of the Equinox and enter the front door of 943 Hyde Park Avenue. At approximately 1:26 p.m., Defendant exited 943 Hyde Park Avenue, walked across the street to the parking lot, and entered the Dunkin' Donuts. At approximately 1:29 p.m., Defendant called the CW and told him to meet him inside the Dunkin' Donuts. Investigators watched as the CW got out of his own vehicle and entered the Dunkin' Donuts. Once inside, the CW sat at a table with Defendant and purchased four fingers of heroin from Defendant for $1,600. The CW left the restaurant, got in his car, and drove away.

At approximately 1:33 p.m., surveillance units saw Defendant leave the Dunkin' Donuts and walk back to the Equinox, which was parked in front of 943 Hyde Park Avenue. Surveillance units followed the Equinox, which stopped briefly at a middle school located in Roslindale. At approximately 2:05 p.m., Defendant drove away from the school. At approximately 2:14 p.m., surveillance units saw Defendant arrive at 20 Gordon Avenue. A child exited the vehicle before Defendant drove away. Surveillance units lost sight of Defendant

shortly thereafter.

## B. Statements Made During Search of 20 Gordon Avenue

On June 8, 2017, at 6:00 a.m., ATF, DEA, and Boston Police officers executed a search warrant at 20 Gordon Avenue, Apartment 2.[2] When they knocked on the door to the apartment, Gonzalez opened the door and allowed the officers to enter. Upon entering the apartment, the agents encountered two boys later identified as the children of Defendant and Gonzalez. As the agents moved farther into the apartment, they encountered Defendant in the kitchen, wearing only his underwear.

Two officers, Agent White and Boston Police Detective Rick Slamin, escorted Defendant to the master bedroom of the apartment. Agent White testified that Detective Slamin read Defendant his <u>Miranda</u> rights in Spanish,[3] and that Defendant then responded that he understood his rights and would answer the officers' questions. Agent White stated that Detective Slamin informed Defendant that a search warrant was also being executed at 943 Hyde Park Avenue, which prompted Defendant to respond that there was "nothing" at the Gordon Avenue apartment, and "everything is there," meaning the Hyde Park Avenue apartment. Shortly thereafter, Agent White received a call from the agents who had executed the search warrant at the Hyde Park Avenue apartment, and they told him that there was a locked door upstairs with a padlock on it. Agent White stated that he asked Defendant about the door, and Defendant responded that "everything was in there." Agent White testified that, during the conversation in the bedroom, neither he nor Detective Slamin made any statements about Gonzalez.

---

[2] Officers simultaneously executed a warrant at 943 Hyde Park Avenue, Apartment 3.
[3] When asked if he speaks Spanish, Agent White hesitated, and then responded "fairly," before stating that he does speak Spanish. Agent White testified that Detective Slamin and his wife speak Spanish, but that he did not believe that Detective Slamin was a native Spanish speaker. When asked if he speaks English, Defendant stated "50 percent." Agent White testified that, during the conversation in the bedroom, Defendant responded to some questions in English.

6

Defendant testified that, as soon as he entered the bedroom with Agent White and Detective Slamin, Detective Slamin[4] immediately said to Defendant, "we know you go to 943 Hyde Park," and "your wife is in the indictment," but "if you cooperate with us, if you help us, we're not going to arrest her. We'll leave her here." Defendant testified that after Detective Slamin made the statement concerning Gonzalez, he answered all of the officers' questions. Defendant stated that he answered the questions because he felt "oppressed," did not want Gonzalez to be arrested, and was worried about what would happen to their children if Gonzalez were arrested. During the conversation in the bedroom, Defendant said he did not believe that he was free to leave. He stated that he could not remember if the officers read him his Miranda warnings before he made the inculpatory statements.

The team of officers that executed the warrant at 20 Gordon Avenue was carrying a video camera, and they used it to record footage before and after executing the warrant, but they did not record any footage of the search of the apartment or the questioning of Defendant.

## II. DISCUSSION

### A. Motion to Suppress Warrant

Defendant moves to suppress the search warrant for 943 Hyde Park Avenue, Third Floor. See [ECF No. 93-3]. He argues that the warrant application did not demonstrate a sufficient nexus between the crime and 943 Hyde Park Avenue.

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called 'nexus' element." United States v. Rodrigue,

---

[4] Defendant did not identify Detective Slamin by name. Instead, he described the officer who made the statement as the officer who spoke Spanish with him, and that the person he was referring to was not Agent White.

7

560 F.3d 29, 32–33 (1st Cir. 2009) (quoting United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005)). "With regard to the 'nexus' element, . . . 'a magistrate has to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Id. at 33 (quoting Ribeiro, 397 F.3d at 49). "Put differently, the application must give someone of 'reasonable caution' reason to believe that evidence of a crime will be found at the place to be searched." Id. (quoting Ribeiro, 397 F.3d at 49).

Here, the investigators presented sufficient evidence of a nexus between the heroin sales and the location to be searched, 943 Hyde Park Avenue, to demonstrate probable cause that evidence related to the drug sales would be located there. On multiple occasions, Defendant and Gonzalez visited 943 Hyde Park Avenue immediately before engaging in a drug transaction with the CW. On March 8, 2017, the day of the third purchase, shortly after Defendant received a call from the CW asking to purchase heroin, investigators observed Defendant travel to 943 Hyde Park Avenue. He spent only a short amount of time there before briefly returning to 20 Gordon Avenue and then traveling to the location of the drug sale. On May 2, 2017, the date of the fourth purchase, Gonzalez traveled directly from 943 Hyde Park Avenue to the location where she sold heroin to the CW. In addition, on June 6, 2017, the day of the fifth purchase, the CW called Defendant and arranged to meet at a Dunkin' Donuts located across the street from 943 Hyde Park Avenue. After calling the CW and arranging to meet in fifteen minutes, Defendant entered 943 Hyde Park Avenue, spent only a few minutes inside, and then walked directly to the Dunkin' Donuts, where he sold heroin to the CW. Furthermore, the Ford Escape that Defendant and Gonzalez used to conduct the first three drug transactions was registered to Julio Mejia at 943 Hyde Park Avenue, Apartment 3.

8

"The nexus between the objects to be seized and the premises searched need not, and often will not, rest on direct observation, but rather 'can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime] . . . .'" United States v. Feliz, 182 F.3d 82, 88 (1st Cir. 1999) (quoting United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979)). In this case, the magistrate judge properly inferred from Defendant's behavior that evidence related to heroin sales was likely to be found at 943 Hyde Park Avenue, Apartment 3. On multiple occasions, Defendant visited 943 Hyde Park Avenue immediately before engaging in a drug transaction, often for just a brief amount of time, suggesting that the purpose of the visit was to obtain heroin or related contraband. In two instances, these visits occurred shortly after the CW called to arrange to buy heroin. Defendant also arranged for one transaction to occur across the street from 943 Hyde Park Avenue. In addition, the car used in three of the observed drug transactions was registered at that address. See United States v. Serrano, 632 F. Supp. 2d 100, 107 (D. Mass. 2009) (observation of defendant going to suspected stash house immediately before delivering drugs to customers contributed to probable cause to believe house was being used in connection with drug trafficking); United States v. McNickles, No. CRIM.A.04-10218 RWZ, 2005 WL 1745661, at *2 (D. Mass. July 25, 2005) (holding that controlled buys of crack cocaine from defendant, combined with observation of defendant leaving stash house to meet cooperating witness to sell him crack cocaine, and agent's experience that most drug dealers have more than one place to store drugs, established "fair probability" that contraband related to drug distribution would be found at stash house). Accordingly, Defendant is not entitled to suppression of the search warrant on these grounds.

## B. Motion to Suppress Statements

Defendant also moves to suppress statements he made to the effect that "nothing" was at the 20 Gordon Avenue, and "everything" was at 943 Hyde Park Avenue. He claims that he only made these statements in response to the officers' threat to arrest Gonzalez if Defendant did not cooperate, and argues that the statements were thus not voluntary and should be suppressed.

"It is elementary that a coerced confession cannot be admitted to prove a defendant's guilt." United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011) (citations omitted). "When charged with determining whether a confession was voluntary, an inquiring court must sift through the totality of the circumstances, including both the nature of the police activity and the defendant's situation." Id. "Relevant considerations may include the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities) imposed upon the suspect." Id. A statement may be involuntary even when it is made after the issuance of Miranda warnings. "The [Supreme] Court has always recognized that the issue of voluntariness is analytically distinct from the issue of the validity of a waiver of Miranda rights." United States v. Daubmann, 474 F. Supp. 2d 228, 234–35 (D. Mass. 2007). "A statement, as the Court recognized early in its Miranda jurisprudence, may be voluntary and yet not the product of a knowing and intelligent waiver of constitutional rights." Id. at 235 (citing Edwards v. Arizona, 451 U.S. 477, 483–84 (1981)). "Conversely, a waiver may be perfectly valid and yet the ensuing confession involuntary." Id. (citation omitted).

Courts have acknowledged that "psychological coercion generated by concern for a loved one could impair a suspect's capacity for self-control, making his [or her] confession involuntary." United States v. Tingle, 658 F.2d 1332, 1336 (9th Cir. 1981) (internal quotation marks and citation omitted); see also United States v. Jackson, 918 F.2d 236, 241–42 (1st Cir.

10

1990). The First Circuit has also held, however, that "the mere fact that a defendant is placed 'under some psychological pressure' by agents does not necessarily render a confession involuntary," United States v. Jacques, 744 F.3d 804, 811 (1st Cir. 2014) (internal quotation marks and citation omitted) and that the "discussion of a family member, on its own, is not *per se* coercive." United States v. Hufstetler, 782 F.3d 19, 23–24 (1st Cir. 2015). The propriety of police tactics in a particular situation is evaluated based on the totality of the circumstances, and relevant factors to consider include the length and nature of the questioning, the existence of explicit or implicit threats, any deprivation of the suspect's essential needs, as well as factors personal to a defendant, such as his age, education, intelligence or evidence of a mental condition that would have made him particularly susceptible to coercion or to having his will overborn. Jacques, 744 F.3d at 809; see also Jackson, 918 F.2d at 242.

In Hufstetler, 782 F.3d 19, the First Circuit considered an issue similar to the one presented here. The defendant was suspected of robbing a bank with his girlfriend, and while interrogating the defendant, police officers frequently referenced his girlfriend, asked about her role in the scheme, and also attempted to play on the defendant's concern for his girlfriend by emphasizing the consequences that she could experience. Hufstetler, 782 F.3d at 20–21. Near the end of the two-hour interrogation, when the defendant "seemed satisfied that his confession would save [his girlfriend] from criminal charges," and a detective told the defendant that "I'm not gonna go from here . . . and just try to rip every part of your life and everybody involved with you," the defendant confessed. Id. at 21. The court determined that the confession was voluntary, that there was "no improper threat or promise," and explained that "[w]ithout more, an officer's truthful description of the family member's predicament is permissible since it merely constitutes an attempt to both accurately depict the situation to the suspect and to elicit more information

11

about the family member's culpability." Id. at 24. The court noted that the officers "never lied, exaggerated the situation, or conditioned either individual's release on [the defendant]'s willingness to speak," but instead told the defendant that his girlfriend "was a suspect and unless new information came to light to discount her culpability she would continue to be criminally liable." Id. at 25. In addition, "the officers also emphasized that they could not, and would not, promise [the defendant] anything in exchange for his confession." Id.

In the present case, even if the Court credits Defendant's testimony, it is not enough to show that his statements were involuntary. Defendant asserts that Detective Slamin said something like "your wife is in the indictment, but we won't arrest her if you cooperate." He does not describe an extended interrogation session, multiple statements concerning Gonzalez, or overt threats about the consequences that would befall his girlfriend or children if he did not cooperate. In light of the totality of the circumstances, this single statement by law enforcement that occurred, at most, a few minutes into a brief interrogation was less coercive than the pressure exerted on the defendant in Hufstetler, and even there found by the First Circuit not to be sufficiently coercive to warrant suppression. Furthermore, the officers' alleged statements, as described by Defendant, explaining that Gonzalez would not be arrested at that time, and would instead stay at the apartment that morning, did not constitute an impermissible promise and were, in fact, less of a threat and more of an accurate statement concerning the situation. Given the absence of impermissible threats or promises or any other improper conduct by the law enforcement officers, there is little, if any, other evidence in the record to warrant suppression— the length and nature of the questioning was relatively brief and limited in scope, Defendant does not allege that he was deprived of food, sleep, or bathroom breaks, and there is nothing about his personal background presented to the Court that would suggest that he was particularly

susceptible to coercion or to having his will overborn. Therefore, considering the entirety of the surrounding circumstances, and the lack of a suggestion of any coercion beyond one statement made by one police officer that fairly described the situation confronting Defendant, the Court cannot conclude that that single statement about Gonzalez, even if credited as true, rendered the confession involuntary.

Defendant also asserts that he was worried about what would happen to his children if Gonzalez were arrested, which contributed to his decision to make the statement that "everything" was at 943 Hyde Park Avenue. While the Court does not doubt that Defendant was genuinely concerned for his children's welfare, that concern is not enough to render his statement involuntary. Importantly, Defendant does not allege that the officers ever mentioned his children, which puts this case on different footing from those in which the police explicitly invoked a suspect's concern about his or her children in order to elicit a confession. See Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (holding confession was not voluntary where police told defendant that "state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate'"); United States v. Tingle, 658 F.2d 1332, 1335–36 (9th Cir. 1981) (holding confession was involuntary where officer told defendant that she might not see her young child for a while if she went to prison, and explaining that "[w]hen law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert . . . 'improper influence'"). While Defendant may well have considered what would happen to his children when the officers mentioned Gonzalez, that does not make his confession involuntary. A desire to mitigate the impact on children that is a result of a defendant's criminal actions is not the same as external pressure intentionally created by law enforcement seeking to guarantee cooperation or elicit a

13

confession. As such, Defendant is not entitled to suppression of the inculpatory statements at issue.

## III. CONCLUSION

Accordingly, Defendant's motion to suppress the search warrant [ECF No. 93] and his motion to suppress his June 8, 2017 statements [ECF No. 94] are <u>DENIED</u>.

**SO ORDERED.**

August 29, 2018 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE